1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   JEREMY RYAN STUTZMAN,                 Case No.:  15cv1756-DMS (NLS)

12                          Petitioner,
                                          **REPORT AND**
13   v.                                    **RECOMMENDATION FOR ORDER**
                                          **DENYING PETITION FOR WRIT**
14   S. FRAUENHEIM, Warden,                **OF HABEAS CORPUS**

15                          Respondent.

16

17          Petitioner Jeremy Ryan Stutzman ("Stutzman"), a state prisoner proceeding pro se

18   with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenges his

19   convictions in San Diego County Superior Court Case No. CN292337 for one count of

20   forcible rape; two counts of forcible oral copulation; two counts of false imprisonment;

21   two counts of sexual battery by restraint; two counts of assault with a deadly weapon; one

22   county of petty theft; one count of second degree robbery; one count of first degree

23   burglary; and one count of carjacking.  (Dkt. No. 1.)  The Court has read and considered

24   the Petition, the Answer and Memorandum of Points and Authorities in Support of the

25   Answer, Petitioner's Traverse, the lodgments and other documents filed in this case, and

26   the legal arguments presented by both parties.  For the reasons discussed below, the Court

27   **RECOMMENDS** the Petition be **DENIED**.

28   /

                                           1

# I.   Factual Background

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  The following facts are taken from the California Court of Appeal opinion (Lodg. 6, Dkt. No. 12-21):

*People's Evidence*

Kimberly M. and Nicole P. lived in Nicole's upstairs apartment. Stutzman lived in the apartment directly below. Nicole and Stutzman were not friends and never had a dating or sexual relationship, but they were neighborly.

One day while Nicole was packing up her belongings from her apartment to move to another part of the state, Kimberly used Nicole's car to take Stutzman to purchase some methamphetamine. When Kimberly and Stutzman returned, they went to Nicole's apartment and the trio smoked the methamphetamine.[1]

After about an hour, Stutzman indicated he wanted to purchase more drugs. Kimberly used Nicole's car to take him to meet his supplier. After driving around for a while, Stutzman told Kimberly he needed to go to his work to get some marijuana from a coworker. Kimberly drove him to his workplace and parked up the street from it. At his insistence, she went inside with him. He began rummaging around looking for something. After about seven minutes, he came up behind her, put his hand around her face, put a knife to her throat, and told her not to say or do anything or he would kill her.[2]  He tied her hands behind her back, put a piece of cloth in her mouth and repeatedly told her he would kill her if she did anything. He took her to an office and had her sit in a chair. He untied her hands and made her call Nicole to say they were running late. He then retied her hands in front of her, put the gag back in her mouth, placed a T-shirt over her head, put his arm around her shoulder and walked her to Nicole's car while holding a knife to her side and threatening to kill her. He grabbed the keys to the car from her, opened the passenger door, pushed her into the passenger seat and drove her back to Nicole's apartment.

Once they arrived back at the apartment complex and parked, he opened the passenger door, grabbed her, put a baseball cap on her head, put his arm around her, and walked her to his apartment. He took her into his bedroom, where there was a chair and black and orange rope. He sat her in the chair and

---

[1] Nicole and Kimberly testified under grants of immunity for any drug-related crimes.

[2] The morning after the incident, Stutzman's employer noticed a large knife was missing from Stutzman's workplace.

tied her ankles to it with the rope. He blindfolded her and exposed her breasts by cutting off her shirt and bathing suit top with a large hunting knife. He rubbed and kissed her breasts and then hogtied her. He moved her to his mattress and held a phone to her ear. He instructed her to tell Nicole they were at his apartment with the drugs and to come down.

Nicole received a phone call from Kimberly, who said she was downstairs with Stutzman, they were going to split up the drugs, and everything was okay. Wanting her keys back, Nicole went downstairs. Stutzman was outside on the phone. Because his door was wide open, Nicole went inside his apartment.

As soon as she entered, the door closed behind her and Stutzman stood in front of her holding a large hunting knife. He told her in a threatening manner to do what he said or he would hurt Kimberly. He dragged her to his bedroom where she saw Kimberly in the corner, on her stomach, hogtied, gagged, and blindfolded. Money and women's clothing were on the ground.

Stutzman sat Nicole on a chair, tied her wrists and ankles to it, and blindfolded her. She asked him what he was doing and he said one of them had "snitched," which confused her because neither she nor Kimberly had done anything that would qualify as "snitching." She kept asking questions and he told her to shut up. She heard him leave the room and go upstairs to her apartment. When he could not get inside, he returned to his bedroom, cut her restraints, put a large jacket over her, and took her to her apartment. Once there, he asked her for her cell phone and her purse, then took her into her bedroom, tied her wrists to her ankles using a tie from one of her robes, and left. At some point, he took her cell phone, purse, laptop, laptop case, and some of her lingerie to his apartment.

While Stutzman was gone, Nicole attempted to free herself. When he returned and saw her attempt, he became very angry. He told her to take him seriously or he would hurt Kimberly. He pulled her up and took her back downstairs. He told her to act normally. He also told her he would kill Kimberly if she screamed.

When they returned to his apartment, he took her to his bedroom and once again blindfolded her, gagged her, and tied her to the chair, but this time more securely. He sliced through her shirt with a knife, exposing her bra. He put her driver's license on her shoulder and started making a video recording. He groped her breast over her bra and said something about doing his job and getting the snitches. He subsequently moved her into the bathroom and turned his attention to Kimberly.

He cut Kimberly's restraints, threw some clothes at her, and instructed her to put the clothing on. Over a 10-minute period, he instructed her to change outfits three or four times. At some point, he took her upstairs to Nicole's apartment. When they returned to his apartment, she was wearing Nicole's lingerie. Stutzman took her to his bedroom. He then went to the bathroom, cut Nicole's restraints, and moved Nicole to his bedroom. He had the two women kneel next to one another with their knees on the floor and their stomachs on the bed.

After making Nicole take her hair down and then put it back up, he took her to the living room where she saw all of her lingerie scattered on the floor. He made her bend over a chair and he pulled down her pants and underwear. He pulled out his penis and put it on her buttocks while rubbing the outside of her vagina with his hunting knife.

He then went back into his bedroom, returned with Kimberly, sat on the couch, and, at knifepoint, demanded Kimberly orally copulate him. He placed his penis in Kimberly's mouth, but she did not suck it. He became angry, pushed her aside and said, "Good thing there's two of you." He went over to Nicole, grabbed her, dragged her to the couch and told her at knifepoint to " [s]uck on it or I'll kill your friend."

Nicole orally copulated him. When his penis became erect, he took Nicole back to the chair, made her bend over it, and penetrated her vagina with his penis. He pulled her hair back, held a knife to her neck and asked her, "Do you like that?"

After some minutes, he dragged Nicole to his bedroom, made her put on black spandex pants, took her to the bathroom, and made her hold onto the shower curtain with her bound hands while he recorded himself putting his hands and mouth on her breasts. He then put her in a corner of his bedroom, hogtied her, tightened her gag, placed a T-shirt over her head, and covered her with a sleeping bag and a large blanket. He ordered her not to scream and told her he was taking Kimberly upstairs. When she told him she was claustrophobic and could not breathe, he told her to shut up.

After he left, Nicole started having a panic attack and "went into Hulk mode." She removed the T-shirt from her head by dragging her head on the floor. She removed the restraints from her wrists by manipulating her wrists and bending them the wrong way. She ran to the apartment of a couple she did not know, knocked on their door, said she had been raped, and asked to call 911. She told them someone with a knife might be following her. She was scared, crying, and shaking, and had pieces of men's neckties tied to her ankles.

Meanwhile, Stutzman took Kimberly to retrieve Nicole's car. When they returned to his apartment, he realized Nicole was gone. He angrily grabbed Kimberly by the neck and said, "Nicole's gone and you're f-ing dead." He grabbed some money from his apartment and took Nicole's purse and some clothing from her apartment. He and Kimberly then went to Nicole's car and left, with Kimberly driving. He told Kimberly that Nicole had "messed this all up for him," his life was ruined, and Kimberly was going to "pay for it."

As they left, they saw a police car pulling into the apartment complex. Stutzman held a knife to Kimberly's side and told her he would kill her if she "even looked in their direction." As they drove, Stutzman threw what appeared to be a cell phone out of the window.[3] At some point, they pulled over and Stutzman started driving.

Upon arriving at the apartment complex, San Diego County deputy sheriffs checked both apartments. Inside Stutzman's apartment, the deputies saw clothing scattered all over the living room and bedroom, small amounts of money scattered in the bedroom, chairs in the bedroom and bathroom with neckties tied to the legs, a kitchen knife on the bedroom floor, and another kitchen knife on the dining room table. There were also numerous items of cut clothing, including neckties, underwear, and a robe belt.

Deputies spoke with Nicole in her apartment. She was disheveled, visibly shaken, very upset, crying, and very concerned and afraid for Kimberly. She had cut neckties tied around her ankles. Her wrists were red and had slight ligature marks around them.

Meanwhile, Stutzman and Kimberly drove for several hours throughout San Diego County. At one point, Stutzman pulled over, forced Kimberly out of the car, leaned her against the hood, rubbed up against her and tried to take her pants off. When Kimberly told him she wanted him to stop, he pushed her back into the car. At another point, Stutzman called his fiancée from a payphone and told her the incident was a misunderstanding, Nicole and Kimberly were lying, and he would "get it cleared up."

Sometime later, Stutzman threw another object from the car.[4]  When the sun began to come up, Stutzman twice attempted to get a hotel room, but was

---

[3] At the sheriff's department's request, Nicole's cell phone carrier pinged her cell phone. A deputy located the phone on top of some leaves a few feet from a roadway, approximately one mile from her apartment.

[4] Stutzman wore a GPS ankle bracelet as a condition of parole to pinpoint his location every minute of the day. Around 11:00 p.m. the evening of the incident, Stutzman's parole officer received a "bracelet

unsuccessful because identification was required. Eventually, Stutzman paid a homeless man to get a room for him. Inside the room, Stutzman threw Kimberly on the bed, rubbed her legs, kissed her neck, and made her put on a black skirt.

That morning, Stutzman contacted his parole officer. He told the officer the incident was a misunderstanding and had Kimberly speak to the officer. Kimberly told the officer the incident was a misunderstanding. The officer asked her to come into his office so Stutzman could be cleared of any allegations, but she said she would rather go home to sleep. The officer then spoke to Stutzman again and told Stutzman to report to the parole office right away.

Stutzman told Kimberly if she told law enforcement the incident was a misunderstanding, he would let her go. He drove her back to the apartment complex, dropped her off on a corner and told her to "stick to your story." She walked across the street to Nicole's apartment. A deputy saw her walking up the driveway crying. She was trembling and had bruises on her arms and legs. She told the deputy Stutzman was driving the same vehicle, he had shaved, he had three knives, and he was possibly staying at a motel by the beach.

Later that morning, sheriff's detectives went to the hotel where they believed Stutzman was staying. They searched the room Kimberly identified and the hallway outside the room. They found her cell phone in a trash can in the hallway. One of the detectives found Nicole's car in the parking lot of an adjacent motel. Inside the vehicle, he found a bathrobe belt that appeared to be cut or ripped. Sheriff's deputies found Stutzman's girlfriend in one of the rooms of the motel. A short time later, a deputy arrested Stutzman in the stairwell of the motel.

A nurse conducted a sexual assault examination of Kimberly. Kimberly had bruising on multiple parts of her body, including her arms, the top of her hands, left shoulder, and left hip. She had ligature marks on her wrists, abrasions and bruises on the top of her feet, and ligature marks on her feet and ankles. Head, neck, oral and genital examinations produced no remarkable findings. The nurse collected a urine sample, a blood sample, and swabs from Kimberly's breasts, cheek, and fingernails. The nurse's observations of Kimberly were consistent with the history Kimberly provided.

Another nurse conducted a sexual assault examination of Nicole. During the examination, Nicole was anxious and tearful. She had redness and abrasions

---

strap alert," suggesting Stutzman tampered with the strap. The morning after the incident, a parole officer found the ankle bracelet in bushes on the side of a freeway.

on her wrists, abrasions on her back and left posterior thigh, and bruises on her shins, left elbow, fingernails, right hand, and left shoulder. She had an abrasion and red area under her tongue. She also had pinprick bruises on the top of her mouth, which is consistent with forced oral sex.

She had "a lot of injury" to her genitalia, including abrasions to her labia minora, hymen, and perihymenal area. She also had a laceration on the bottom of her vagina caused by blunt force trauma. The nurse testified this type of injury is a mounting injury and generally occurs "when a penis or an object first is going into the vagina." The nurse described the injury as "huge" and the laceration as "open" and "seeping," indicating it happened a few hours prior to the examination. The injury was consistent with nonconsensual sexual activity.

The nurse collected various samples from Nicole, including a urine sample and swabs from Nicole's mouth, vagina and anus. The nurse concluded Nicole suffered blunt force trauma genitally and indicated the examination was consistent with the history provide by Nicole.

The same nurse also conducted a sexual assault examination on Stutzman. She collected a blood sample from him and took swabs from his cheek, penis and scrotum.

DNA analysis of the samples indicated there was no male DNA in the oral and breast swabs taken from Kimberly and no semen in the oral and fingernail swabs. There was no semen or male DNA in the vaginal, external genital, and breast swabs taken from Nicole. There was semen and DNA from an unknown male in the swabs taken from Nicole's buttocks.

There was no semen in the swabs taken from Stutzman. The penile swabs taken from Stutzman showed a mixture of DNA from at least three contributors, two of whom were major contributors. Stutzman was included as one of the major contributors and Nicole was included as a possible major contributor. It was 2.2 million times more likely Stutzman and Nicole were the major contributors than Stutzman and an unknown person. The scrotal swabs taken from Stutzman also showed a mixture of DNA from at least three contributors. Stutzman was included as a major contributor, but due to the sample's low level the other contributors were unknown.

Jennifer R. testified that 11 years before the events of this case, Stutzman went to her apartment to retrieve some videotapes he had loaned her brother.[5] When he arrived, Jennifer was talking on the phone and the videotapes were

---

[5] Jennifer was deemed unavailable as a witness and her prior testimony was read into the record.

on the floor by the door. Rather than grabbing the videotapes and leaving, Stutzman stepped inside, stating he left something else there as well. She told him to feel free to get whatever it was. Instead, he sat on the couch, started talking to her four-year-old nephew, and waited for her to get off the phone. When she hung up the phone, he told her he left a bag in her back bedroom. She told him to get it, but he said he did not want to go back there and look through her stuff. She asked him to describe what he was looking for and told him she would get it. She started walking back toward her room and, as soon as she was out of her nephew's sight, Stutzman came up behind her and pulled a gun out of his fanny pack. He held the gun to her head and told her to "shut up and don't be stupid." He directed her to go into the bedroom.

He looked through her closet and told her he wanted her to change clothes. She put on a T-shirt and a long skirt. He asked her if she had anything sexier to put on and she said she did not. He hogtied her with rope from his fanny pack. He also blindfolded and gagged her. At some point after he gagged her, her nephew knocked on the door. Stutzman removed the gag and told her to tell her nephew she was sick and was going to lie down. After she complied, he replaced the gag.

Stutzman momentarily left the room and returned with a knife and a bagful of clothing. He cut the ropes off her, removed the blindfold and gag, and directed her to put on stockings, a skirt, and some shirts. He then directed her to go to the bathroom where he put the blindfold back on her, tied her hands together above the shower rail, and cut off her skirt and shirt with the knife. Over the course of six hours, with a few breaks so she could attend to her nephew, he continued a pattern of making her change clothes, tying her up in different positions or places, and then cutting or ripping the clothes off. At one point while she was completely bound, he made her bend over a chair and he put a knife to her throat while he rubbed her back, legs, and bottom with his erect penis. He tried to use a ball gag, but it would not fit into her mouth. He also covered her face with what looked like a muzzle and put a dog collar around her neck.

At another point, he tied her to a chair, put a knife to her throat, and said, "I hate when they cry," and began to touch the insides of her leg. He cut the ropes and told her to lie on the bed. He cut or ripped off the negligee he had made her wear and began rubbing her chest and stomach and kissing her neck and breasts. After about five minutes, he became upset and said, "I can't do this. I got to leave." They both dressed and gathered up his things and some of hers. Before he left, he asked her if she was going to tell her brother. She told him she was not going to tell her brother or call the police. He apologized, shook her hand and told her he would call her brother later that evening. After

crying for 10 minutes, she called her brother and told him to come home. Then she went to work, told her friends what happened, and eventually called the police.

*Defense Evidence*

A psychiatrist testified regarding methamphetamine use and its effects on the brain. These effects include psychosis, visual distortions, distortion of reality and sense of time, and suggestibility. Laboratory results showed a relatively low level of methamphetamine in Stutzman's blood stream, although the amount at the time of ingestion would have been high enough to cause amphetamine intoxication. The results showed a higher level of methamphetamine in Kimberly's bloodstream. She also had marijuana in her bloodstream. Nicole had a significantly higher level of methamphetamine in her system, indicating a greater amount of drug abuse. Nicole also had marijuana and cocaine in her system. All three drugs will alter a person's perception of reality and abused together could have an additive or even magnifying effect. Someone under the influence of drugs, alcohol, or a combination of drugs is more likely to have perception errors than a person who is not under the influence.

Nicole's former boyfriend testified Nicole lied and cheated during their relationship. She also falsely accused him of pushing her against the wall, which caused him to spend a week in jail. On another occasion, she attacked him and called the police, which resulted in his arrest.  After they broke up, she threatened to call the police and say he pushed her down the stairs.

Several witnesses testified as to Stutzman's good character. Stutzman also testified in his own defense. He admitted using drugs with Nicole and Kimberly and claimed any sexual activity was consensual. He said they tied him up first and he admitted tying them up, too, but claimed it was brief and part of a consensual roleplaying sex game. The women both tried on different clothing, which he cut off as part of the role-playing. His threats to the women were also part of the role-playing. He stated Nicole attempted to orally copulate him, but he was unable to achieve an erection. After a while, Nicole uttered something, which included the word "rape" and ran out the door. Surprised, he asked Kimberly, "Was that for real?" Then, fearing repercussions if the police arrived, he packed some items and left with Kimberly, who went with him voluntarily.

*Rebuttal Evidence*

A sheriff's detective interviewed Stutzman after the incident. During the interview, Stutzman's memory of certain parts of the incident was "vague."

He had no memory of the oral sex or intercourse that occurred. He explained he was intoxicated during the incident. He also admitted Kimberly was crying when she was in the car with him.

(Lodg. No. 6, Dkt. No. 12-21 at 3-15.)

## II.   Procedural Background

On November 2, 2011, the San Diego County District Attorney filed an information charging Stutzman with one count of forcible rape, a violation of California Penal Code § 261(a)(2) (count 1); two counts of forcible oral copulation, a violation of Penal Code § 288a (counts 2 & 3); two counts of kidnap to commit rape or oral copulation, a violation of Penal Code § 209(b)(1) (counts 4 & 5); two counts of sexual battery by restraint, a violation of Penal Code § 243.4(a) (counts 6 & 7); two counts of assault with a deadly weapon, a violation of Penal Code § 245(a)(1) (counts 8 & 9); two counts of second degree robbery, a violation of Penal Code § 211 (counts 10 & 11); two counts of first degree burglary, a violation of Penal Code § 459 (counts 12 & 13); and one count of carjacking, a violation of Penal Code § 215 (count 14.)  (Lodg. 2 (1CT) at 9-16.) The information further alleged counts 1-3 were committed under certain aggravating circumstances within the meaning of the One Strike Law, that Stutzman used a knife during the commission of the offense as to counts 1-6, 10 and 11, and that Stutzman had a serious felony and strikes.  (1 CT 11-17.)

The court held a jury trial, and on April 10, 2012, a jury convicted Stutzman and found him guilty as charged on counts 1-3, 6-9, 11, 13 and 14.  The jury found Stutzman guilty of the lesser included offense of false imprisonment in counts 4 and 5, and guilty of the lesser included offense of petty theft in count 10.  The jury found Stutzman not guilty of count 12.  (1 CT 147-71; 2 CT 408-09.)  The jury found all special allegations true, with the exception of two of the "One Strike" special allegations.  (1 CT 147-71.) The court found true the prior conviction allegations.  (2 CT 410.)  Stutzman was sentenced to 400 years to life, plus 16 years.  (2 CT 415-16.)

Stutzman appealed his convictions to the California Court of Appeal.  He claimed:

(1) the trial court violated his right to a unanimous jury decision by discharging a holdout juror; (2) insufficient evidence supported his carjacking conviction; (3) the trial court erred in admitting propensity evidence because the statute is facially unconstitutional; and (4) the trial court abused its discretion by not excluding propensity evidence.  (Lodg. 3.)  The Court of Appeal issued a written opinion affirming the judgment.  (Lodg. 6.) Stutzman filed a petition for review in the California Supreme Court.  (Lodg. 7.)  He raised claim one in the petition, but did not raise claim two.  (Id.)  On April 30, 2014, the California Supreme Court summarily denied the petition without comment and without citation to authority.  (Lodg. 8.)

Stutzman did not file any state habeas corpus petitions.  He constructively filed the petition for writ of habeas corpus ("Petition") under 28 U.S.C. section 2254 in this Court on July 29, 2015.  (Dkt. No. 1.)

Respondent states the Petition is timely, and Respondent filed an answer and memorandum of points and authorities.  (Dkt. No. 11.)  The Court granted Stutzman a number of extensions to file his traverse, and then accepted for filing his traverse.  (Dkt. No. 25; Dkt. Nos. 27 and 28.)

## III.   Discussion

Stutzman makes two claims in his Petition.  First, he claims his right to a unanimous jury decision was violated when the trial court discharged a juror and replaced that juror with an alternate, and ordered the newly-composed jury to continue deliberating.  (Dkt. No. 1 at 6.)  Second, he claims the evidence was insufficient to sustain the carjacking offense.  (Id. at 7.)  In support of his Petition, he attaches the reply brief his counsel prepared and filed in the California Court of Appeal.  (Id. at 15-30.)

Respondent, without waiving exhaustion, addresses the merits of both of Stutzman's claims in his answer.  Respondent asserts Stutzman failed to prove the state courts' rejection of his claims were not on the merits or that the rejection of his claims were objectively unreasonable under section 2254.  (Dkt. No. 11 at 2.)

/

### a.  Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition will "not be granted with respect to any claim adjudicated on the merits in State court proceedings unless the adjudication of the claim -- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law … ; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Early*, 537 U.S. at 8.  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" the state court decision will not be "contrary to" clearly established federal law.  *Id.*

The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Bell v. Cone,* 535 U.S. 685, 694 (2002).  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable."  *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the

basis for the higher court's denial of a claim or claims.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).

### b.  Claim One: Juror Removal

The following facts, which relate to Stutzman's juror removal claim, are taken from the Court of Appeal opinion:

> After the jury had deliberated a little over a day, the court received a note from four jurors asking: "If a juror expresses that they have reached a conclusion before deliberation on one or more counts/allegations, are they violating the duty to deliberate to the degree that they need to remove themselves or be removed from the process[?]" At the same time, Juror No.3 submitted a note asking: "Once a charge slip is written and remains in the jurors room as to guilt or not guilt can the slip be changed to be guilt or not guilt[?]" (Some capitalization omitted.)

> Outside the presence of the other jurors, the court and counsel spoke to Juror No.5, the foreperson, about the note. Juror No.5 stated Juror No.3 "made several comments yesterday that his mind was made up that there's nothing that we could talk about that would change his mind. He had already made his decision." This led to "some argumentative talk" about the rules of deliberation and the need to listen and keep an open mind, but Juror No.3 "came back today and he--he won't say he's made up his mind on all 14 counts, but he says he wants to change all his choices that he's decided on so far."

> When the court suggested it appeared Juror No.3 was continuing to deliberate, Juror No.5 disagreed, explaining Juror No.3 was "saying that he was forced yesterday to make decisions he felt pressured and that he feels in his mind he's already made his decision on all counts." Juror No.5 further explained the other jurors felt Juror No.3 "won't listen to us" and he was "not following the protocol in the book." He believed Juror No.3 had "preconceived what his decisions were." Juror No.5 elaborated, "[Y]esterday, we went through the process. There's a one, two, three, four, we're following a process. He

answered those four questions which would lead [to] a verdict one way or the other. After he saw where the verdict was going, he's like, 'No, I change my mind.' Even though that in his mind he already knows what everything is going to be."

The following colloquy then occurred:

"THE COURT: But what I'm getting is that the juror said, okay, I made up my mind[.] I listened to the evidence[.] I've come to the jury room I think the verdict ought to be this. And then he heard other jurors say other things and then he said, you know what, maybe my verdict out [sic] to be the other thing.

"THE FOREPERSON: No, that's not how it was.

"THE COURT: Okay. How was it then?

"THE FOREPERSON: Yesterday he came in, his mind set, this is how it's going to be and I don't care what you guys say, I don't care what facts you have, I've already made up my mind. I sat in there and this is my decision. And then we're like, well, that's not what deliberation is. When you go in there, you need to come with an open mind, you can have feelings one way or the other but just listen to the evidence and listen to the facts and then you can decide for yourself either way. We're completely open. But he's not. He's not listening. Like he's predetermined already on everything. Like no matter, we go one way or the other way, there's--He's already made up his mind and he's stated that. There's two other people there that heard him state facts that heard that he came already predetermined.

"THE COURT: Again, he came predetermined to vote one way yesterday and today his vote—

"THE FOREPERSON: No. His vote was kind of that way the other day and then he felt we pressured him. He said he couldn't sleep because he felt pressured and now wants to change his decisions.

"THE COURT: Isn't that deliberating?

"[DEFENSE COUNSEL]: [¶] ... [¶] Sounds to me like what you're saying is that he came in with these preconceived notions, had a

discussion about what deliberation is. He said, let's go through these four points, he kind of agreed with those four points, and came to a conclusion that's different than his preconceived ideas and now he's upset by that?

"THE FOREPERSON: Yes.

[¶] ... [¶]

"[PROSECUTOR]: Did he express at the beginning of the outset, before deliberations, some type of opinion? Again, don't tell me what way. Did he express that before there were deliberations?

"THE FOREPERSON: Yes. When we started deliberation—I won't say—we just all felt like we needed—we sat here for two weeks, we just need to talk. So everyone had a chance to go around the table and say whatever they wanted. I believe at that point that could have been that he stated something similar to that.

"[PROSECUTOR]: And by 'something similar to that,' do you mean, again, the whole time? We don't want to hear which way.

"THE FOREPERSON: I know.

"[PROSECUTOR]: Something that he stated at the beginning, did that indicate to you a —expressing a fixed conclusion at that time?

"THE FOREPERSON: Yes, yes.

"[PROSECUTOR]: Okay. And then there was some discussions, was there agreements reached or verdicts reached on some counts at some point?

"THE FOREPERSON: Yes.

"[PROSECUTOR]: And then that was yesterday?

[¶] ... [¶]

"THE FOREPERSON: Yes.

[¶] ... [¶]

"[PROSECUTOR]: And then today, came in and expressed wanting to go back to what the fixed position he had indicated at the outset of the deliberations?

"THE FOREPERSON: Yes.

"[PROSECUTION]: Was there any discussion that contributed to that or---

"THE FOREPERSON: No.

"[PROSECUTION]: Why do you say no?

"THE FOREPERSON: ... [W]hen we came in this morning, he was the first one to speak. So nobody had spoken or deliberated at all.

[¶] ... [¶]

"[PROSECUTION]: Did he, either yesterday or today, express a refusal to consider other points?

"THE FOREPERSON: Yes. And it was stated, three people for sure heard it.

"THE COURT: Was there a particular juror that he had any kind of a confrontation with about not deliberating?

"THE FOREPERSON: No.

"THE COURT: Okay.

"THE FOREPERSON: It was mainly around the table, not everyone agreed but most everybody agreed."

The court then spoke with Juror No.12, who indicated Juror No.3 made it "very clear" the previous day his mind was made up and he was not going to change his mind. After the jurors quoted the instructions and discussed the need to "go through everything," Juror No.3 returned from lunch and

deliberated "a little bit or at least he changed his mind" and the jury made a few decisions. That morning, however, Juror No.3 stated he wanted to change the previous day's decisions and "he's already made his mind up and that he, you know, isn't really going to bend that much on it." He did not try to state why he held his opinions or convince anyone else to be on his side. He declined to explain the basis of his opinion stating, "I don't need to, I heard the testimony." He gave his conclusions, but not the reasons why he came to them. According to Juror No.12, "[f]or a moment in time" after lunch the previous day, Juror No.3 was "close" to being willing to consider other points of view. However, as of that morning, Juror No.3 was not considering other points of view and stated, "I've made my mind up and this is how I'm going to stand on things." He also stated, "hung jur[ie]s happen all the time, it's not a big deal, it's okay if it happens." According to Juror No.12, there were jurors holding very strong on both sides, but yesterday they had talked through and come to agreement on some things. That day, however, no deliberations had occurred because Juror No.3, made it clear he was not going to bend.

The following colloquy then occurred between Juror No.12 and the prosecutor:

"[PROSECUTOR]: I'm trying to distinguish between whether or not he'll change his conclusion, is one thing, whether he's open to discussing [it] with other jurors, listening to points of view or giving his own, whether he's willing to or not willing to.

"JUROR NUMBER 12: I don't think he's willing to give his point of view, other than, this is my decision. I don't think he's willing to back it up with, here's the information we received and this is why I believe this way. He's just going, I heard it and so I believe it and this is where we're going to go. Which really isn't deliberating.

"[PROSECUTOR]: Was he willing to discuss other people's points of view or did he just not participate when they were discussing their points of view after this morning[']s--

"JUROR NUMBER 12: The closest thing that I could say, in the discussions, he mumbles, 'Oh, that's a whole bunch of crap.' That's the closest I can say that he discusses."

The court and counsel then spoke to Juror No.3. He stated, he "love[d] deliberating" and was "willing to formulate arguments either for or against, if

they are in a context of a listening environment[,] and an environment [of] conviviality and non-conjecture." He said some of his points had been rebutted by the other jurors and there was "an early-on sense of indifference that is uncomfortable."

When the court asked if he was willing to share his ideas about the evidence, Juror No.3 stated, "I can sit and listen to their view points on the evidence." When asked whether he was willing to tell the other jurors his views and why he reached them, he said he already had. He also said he thought he had "stated enough of my view for them to be comfortable accepting my views as my views and their views are their views and my views are mine. It's okay to be incomplete on all of them, we're given that right to be incomplete."

When the court asked once again whether he was willing to share his ideas about the evidence, the witnesses, and the trial with the other jurors, he stated, "There's a thick air about it and it would make some of that difficult to--a timely egress through that would be hard on both sides at this point." Nonetheless, he stated he was willing to do it if the court directed him to do so.

When the court asked yet again if he would be willing to explain his view if one of the jurors wanted to know why he thought a certain way, he responded, "Not when there's an air of ambiguity and finger pointing an honest of conjecture as to my difference to their points."

The court then asked whether it would be fair to say he was through explaining his positions. The court clarified he did not have to change his mind. Rather, he needed to be willing to continue engaging in dialog by both giving his ideas and listening to the other jurors' ideas. Juror No.3 responded that he had expressed his views "enough," he felt a "cold sense of unacceptability" from the other jurors and they were at an "impasse."

The following exchange then occurred:

"THE COURT: Here's kind of where I think we are. You're telling me you listened to the evidence, you used your judgment, and you kind of made decisions on everything.

"JUROR NUMBER 3: That was brought out that we were discussing, not anything else.

"THE COURT: But my question is, it's the same question: [¶] Whether or not you're still willing to talk to the other jurors about why you support your positions and listen to the reasons why they support their positions?

"JUROR NUMBER 3: I stated that over and over and over and over, and that's where we[']re at now with how I've stated that. I've stated that in four or five different ways of the same thing. I mean, I'm not inarticulate to where I can't express my emotional view points or my verbal view points or any view points in a manner that's discernible at all [¶] And so, like 1 said earlier, I think it's reached a point of mutuality, in a sense.

"THE COURT: Do you think additional deliberations would be of no value?

"JUROR NUMBER 3: Yeah. If they can't accept and need more discussion, I feel I've already discussed enough.

"THE COURT: How about the opposite of discussing, how about listening? Have you listened enough or are you willing to listen some more?

"JUROR NUMBER 3: I've listened quite attentively throughout the whole trial.

"THE COURT: No, I understand that.

"JUROR NUMBER 3: And in the deliberation room.

"THE COURT: Are you willing to listen some more?

"JUROR NUMBER 3: If it's just about me wanting to, hell no, to be frank. You know, I can care less whether I see some of the people or not for the rest of my life.

"THE COURT: Here's what I have to decide, we spent two weeks doing this so far-

"JUROR NUMBER 3: I understand.

"THE COURT: ---and I have to decide what to do. And so you're right now you're the key to that.

"JUROR NUMBER 3: Yeah. Hard as that is to accept, I realize full well.

"THE COURT: Normally, I send everybody back in the jury room and say, 'Give it some more time, it's only been a day, go back and talk some more see what happens.' [¶] So my question to you: [¶] [W]ould that be a complete waste of time to send all of you back in there?

"JUROR NUMBER 3: That's where they're at and I can go home and sleep well tonight, if that's the case now. But you need a direct answer on me from that point and I'm conflicted. I want to but I don't want to, just the same.

"THE COURT: I can understand not wanting to, but are you willing to go back and talk for another period of time? Talk and listen.

"JUROR NUMBER 3: Talk and listen. I got a--I have everybody's voice in my head right now as to what I presume to be the points of interest and-

"THE COURT: Sounds like you really don't want to hear more.

"JUROR NUMBER 3: I really don't as it washes out and pans out. I really don't.

"THE COURT: You really think you've already told them your opinions and you don't want to tell them any more?

"JUROR NUMBER 3: I'm comfortable with that and they're comfortable with me with that. And-

"THE COURT: Okay.

"JUROR NUMBER 3: -I'm comfortable with them, with their's also. I don't have any ambiguity that way either.

"THE COURT: So pretty much you're through talking and through

listening?

"JUROR NUMBER 3: On the points--on the points that we've discussed. If there's new points and like if these are done and through and we're moving on, on new points, I'm willing to discuss new points. [¶] You know, but if they want to rehash these old talid and rattled pangs of clonging bells, then I don't want to be there." (Spelling and punctuation errors in original.)

The court then permitted counsel to question Juror No.3. Defense counsel began the questioning and when he informed Juror No. 3, the other jurors indicated Juror No.3 had made his mind up prior to deliberations, Juror No.3 responded, "That was a misconstrued breach." He said he felt compelled to go against his beliefs, then went home and thought about it and returned that day and expressed his position. He felt his integrity was being "held to task."

When questioned by the prosecutor, he indicated they were "not even close" to going through the 14 different counts and allegations. He also stated he felt disrespected by the other jurors. In response to the prosecutor's comment that it appeared he did not want to continue deliberations, Juror No. 3 acknowledged, "it would be hard under the air of what it is now." When the prosecutor asked him specifically whether, in light of the difficulties he articulated, he could go back into the jury room and continue deliberating, he responded, "Okay. If it would make it easier, like I said earlier, I would rather not." The following exchange then occurred:

"[PROSECUTOR]: You would rather not be on this jury?

"JUROR NUMBER 3: I would rather discontinue, yes, sir. I've been on a trial, it was a civil trial about 10 years back and lasted up--it was about a solid 6 weeks. So it's not like I haven't done this before and I haven't been willing to listen to God-awful boring tax information. We deliberated, I think it was about four days solid or more, that's an--that was about four days. [¶] So I've been through the process of a marathon in regards to the judicial system and facilitation and what I'm obligated and admonished to do. [¶] And so with this being as it is now, this particular trial being as it is now, and the --just the feeling of the air of disdain is difficult.

"[PROSECUTOR]: Let me put it to you this way, not wanting to know where you stand, one side or the other, can you, from this

point forward, not saying you've start fresh, you don't. You've had deliberation, I understand that. But there's potentially more discussions to be had about the different counts and allegations. Can you—

"[JUROR NUMBER 3]: I can't trust that they wouldn't continually go back to this.

"[PROSECUTOR]: Can you in fairness to both sides equally fair to the People and the defense, go back there and discuss with those other jurors the remaining things to be discussed and listening fully and also articulating your points of view fully?

"[JUROR NUMBER 3]: I'm human and I tend to close out after a period of time when there's inability to--inability to communicate.

"[PROSECUTOR]: I don't want to put words in your mouth, would it be fair to say you're essentially saying, hey, I'm done?

"[JUROR NUMBER 3]: As I've said before twice, I believe, yes, I do believe that in my heart."

The court then stated it needed to decide whether Juror No.3 was willing to continue to deliberate. Juror No.3 responded, "No I do not want to deliberate anymore on this particular case." He subsequently clarified he was also unwilling to deliberate further.

After the court concluded its questioning and Juror No. 3 left the courtroom, the prosecutor asked the court to excuse Juror No. 3. Defense counsel discussed the matter with Stutzman for several minutes and then acknowledged the juror's confirmation he would not deliberate "ties the court's hands." Defense counsel stated he understood why the court would want to dismiss the juror and said, "I think we can live with that." When the court asked defense counsel if he wanted to take a position on the record regarding whether the juror should be excused, defense counsel stated, "We can let him go." The court subsequently excused Juror No.3 and replaced him with an alternate.

(Lodg. 6 (Dkt. No. 12-21 at 16-26.))

/

### i.  Court of Appeal Opinion

The Court of Appeal stated it found ample evidence in the record to support the trial court's finding that Juror No. 3 refused to deliberate.  The court recounted how evidence indicated Juror No. 3 expressed a "fixed conclusion at the outset of deliberations and would not consider other viewpoints" and would not explain his positions or discuss their bases.  (Lodg. 6 at 29.)  The court also noted how although Juror No. 3 claimed he loved deliberating, he "also stated he had expressed his views enough," did not want to continue talking or listening to other jurors, and did not think additional deliberations would be helpful.  (Id.)  The court further referenced evidence that when the trial court asked Juror No.3 whether he would be willing to continue deliberating, he responded with "an unequivocal 'no.'" (Id.)  The Court of Appeal also reasoned that when counsel asking clarifying questions to the juror, the record demonstrated counsel did not elicit information about the jury's leanings and framed their questions using nonjudgmental language.  (Id. at 30.)  The court further reasoned that by the time the prosecutor questioned the juror about his willingness to deliberate, Juror No. 3 had already previously and "by his own characterization … expressed his unwillingness to the court multiple times."  (Id.)  For these reasons, the Court of Appeal held Stutzman had not shown the trial court abused its discretion by dismissing Juror No. 3.  (Id.)  In light of this conclusion, the Court of Appeal stated it did not need to address Stutzman's corresponding ineffective assistance of trial counsel argument.  (Id.)  The Court of Appeal affirmed the judgment.  (Id. at 36.)

### ii.  Analysis

Stutzman claims the state court violated his constitutional right to a unanimous jury decision when it removed Juror No.3.  (Dkt. No. 1 at 6.)  He contends the trial court improperly discharged Juror No.3 during deliberations even though the juror was deliberating and the "holdout" juror.  He further contends the trial court improperly permitted the prosecution to question Juror No.3, which led the juror down the path of deciding he did not want to deliberate further and out the discharge door.  (Id. at 20.)

Stutzman also argues if the Court agrees with Respondent's contention that his trial counsel effectively acquiesced to dismissing Juror No. 3, then the Court should find Stutzman received ineffective assistance of counsel.  (Id. at 21.)

Respondent contends the state courts properly rejected Stutzman's claim that his right to a unanimous jury verdict was violated by Juror No.3's removal.  (Dkt. No. 11-1 at 27.)  In support, Respondent asserts the state court's factual findings must be presumed correct unless Stutzman proves otherwise by clear and convincing evidence.  Respondent recounts the underlying jury deliberation discussions regarding whether Juror No.3 would continue to deliberate.  (Id. at 28-37.)  Respondent contends that here, the state court's determination to remove Juror No.3 was neither contrary to nor an unreasonable application of United States Supreme Court precedent.  (Id. at 38, 42.)  Respondent argues that a state court's determination that a petitioner's claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on whether the decision was correct, and here, reasonable jurists could disagree with the state courts' analysis.  (Id. at 42, *citing Harrington v. Richter*, 562 U.S. 86, 101-02 (2011).)

In his reply brief, Stutzman reasserts his position that Juror No.3 continued to deliberate.  (Dkt. No. 25 at 5, 11-12.)  He points to information in the record that he contends showed Juror No.3 wanted to continue deliberating (id. at 14, *citing* 10 RT 1619, 1623-24), and wanted to ask the Court some questions via a note, which purportedly would have resolved his concerns so that he could continue deliberating.  (Id. at 14, *citing* 10 RT 1028.)  He also reasserts the prosecutor's line of questioning and the court's repeated questioning about whether Juror No.3 could deliberate were improper. (Id. at 5, 14.)  Stutzman also reasserts his ineffective assistance of counsel argument.  (Id at 18-19.)

First, to the extent Stutzman claims the state court violated his constitutional right to a unanimous jury when it dismissed Juror No.3, such a claim is not cognizable on federal habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law

questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States"); *see Johnson v. Louisiana*, 406 U.S. 356, 358-363 (1972) (United States Supreme Court "has never held jury unanimity to be a requisite of due process of law" and the Court has "expressly said that 'in criminal cases due process of law is not denied by a state law . . . which dispenses with the necessity of … unanimity in the verdict.'") (citation omitted). Stutzman's federal habeas claim challenging whether the trial court erred in dismissing Juror No. 3 thus comes down to whether removing the juror violated Stutzman's Sixth Amendment right.

State criminal defendants have a federal constitutional right to a fair and impartial jury. *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968). The juror substitution procedure outlined in California Penal Code section 1089 protects a defendant's constitutional right to an impartial jury, which is guaranteed by the Sixth Amendment. *Bell v. Uribe*, 748 F.3d 857, 867-68 (9th Cir. 2014). Under section 1089, a juror may be removed from service either before or after final submission of the case if the juror becomes ill, dies, or upon other "good cause." *Id.* at 862, fn.1.  Thus, a reviewing habeas court determines whether the state court's application under the circumstances violated the petitioner's Sixth Amendment rights, which depends on whether good cause existed for the removal. *See Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir. 1997) (noting that because Miller found that § 1089 was constitutional on its face, the sole inquiry was whether the substitution violated petitioner's Sixth Amendment rights in light of the trial court's finding of good cause).

On habeas review, a trial court's findings regarding juror fitness (i.e., that good cause exists under section 1089 to remove a juror) are entitled to special deference. *Perez*, 119 F.3d at 1426 (*citing Patton v. Yount*, 467 U.S. 1025, 1036-38 & n.12 (1984)). The trial court is in a superior position to observe the juror's appearance and demeanor and thus to determine the ability to continue deliberating. *Id.* at 1427.

Here, the state court's finding of good cause to remove Juror No.3 was neither

contrary to nor an unreasonable application of United States Supreme Court precedent. Stutzman's contention that the trial court improperly discharged Juror No.3, who was in Stutzman's view the "holdout" juror during deliberations, is unavailing.  Although in *United States v. Symington*, 195 F.3d 1080, 1088 (9th Cir. 1999), the Ninth Circuit held a juror dismissal violates the Sixth Amendment when it is "reasonably possible that the impetus for [the juror's] dismissal came from her position on the merits of the case," the Supreme Court has since held that federal habeas courts cannot rely on circuit precedent when adjudicating such a claim in a case governed by AEDPA.  *Williams v. Johnson*, 824 F.3d 814, 817 (9th Cir. May 27, 2016), *citing Glebe v. Frost*, 135 S. Ct. 429, 431 (2014). Instead, this Court may only grant relief if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  *Williams, citing* 28 U.S.C. § 2254(d)(1). Stutzman has not cited, and this Court is not aware, of any Supreme Court authority imposing the holding the Ninth Circuit reached in *Symington*.  Thus, Stutzman is not entitled to relief on this basis.  Indeed, even a trial court's knowledge that the excused juror was the sole holdout for acquittal does not in itself invalidate the decision to excuse the juror.  *See Perez,* 119 F.3d at 1427 (dismissal of holdout juror permissible because juror's emotional instability that made her unable continue deliberating provided good cause for her dismissal).

Further, for the reasons discussed below, Stutzman has not shown the state appellate court's factual determinations were unreasonable.  *See* 28 U.S.C. § 2254(d)(2). As the California Court of Appeal noted, Juror No. 3 expressed on his own accord, and on multiple occasions, his unwillingness to continue deliberating.  (Lodg. 6 at 29.)  Juror No. 3's refusal and unwillingness to consider the evidence and listen to other jurors were inconsistent with the fundamental tasks of a juror.  His own statements of unwillingness to continue deliberating supports the state court's finding of good cause to remove him.

Stutzman's contention that the trial court improperly permitted the prosecution to question Juror No. 3 and led him down the path of deciding he did not want to deliberate

further and out the discharge door, is also unpersuasive.  As the California Court of Appeal noted, and as the record reflects, Juror No. 3 expressed his unwillingness to deliberate to the trial court multiples even *before* the prosecutor had questioned him, and continued to express his unwillingness to the court after the prosecutor questioned him. (Lodg. 6 at 29-30.)

Stutzman points to other instances in the record that purportedly demonstrates Juror No.3 was willing to deliberate the remaining counts.  (Dkt. No. 25 at 14, *citing* 10 RT 1619, 1623-24.)  He contends the juror asked the foreperson to send a note containing questions to the court, but the court did not see the note before it inquired into whether Juror No.3 would continue to deliberate.  (Id., *citing* 10 RT 1628.)  Stutzman contends Juror No.3 believed that if his questions had been answered sooner, he would have been able to continue deliberating, and so the trial court's inquiry into whether Juror No.3 would continue deliberating was premature.  (Id.)

As the Court previously noted, a state court's findings of fact are presumed correct and can be contravened only if the petitioner can show by clear and convincing evidence that the findings were erroneous. 28 U.S.C. § 2254(e)(1).  Stutzman's citations to the record do not present clear and convincing evidence to contradict the trial court's finding of good cause to remove Juror No.3.  The Court of Appeal recognized the trial court had received Juror No.'s 3 note at the outset.[6]  (Lodg. 6 at 16.)  The Court of Appeal also acknowledged that Juror No.3 expressed at the outset that he "loved deliberating" and was "willing to formulate arguments … if they are in a context of a listening environment[,] and an environment [of] conviviality and non-conjecture."  (Lodg. 6 at 21, referencing 10 RT 1619.)  The Court of Appeal also recognized the discussions that occurred between Juror No.3 and the trial court that the juror had discussed only some and not all of the counts.  (Id. at 22, referencing 10 RT 1623 and 1624.)  But this

---

[6] Additionally, although not expressly noted by the Court of Appeal, the record appears to reflect that the trial court answered Juror No.3's question before delving in to determine whether Juror No.3 was willing to continue deliberating.  (10 RT 1618.)

evidence to which Stutzman points does not negate the further factual findings that Juror No.3 thereafter repeatedly expressed his unwillingness and decision to not continue deliberating.  (Id. at 29-30.)  Thus, absent clear and convincing evidence to the contrary, the Court defers to the state court's factual findings.

The Court of Appeal also determined that in concluding the trial court did not abuse its discretion by dismissing Juror No. 3, it did not need to reach Respondent's argument that Stutzman's trial counsel effectively waived the issue, and thus likewise did not need to reach Stutzman's corresponding ineffective assistance of counsel argument. (Lodg. 6 at 30.)  So too here.  This Court has likewise reached and addressed Stutzman's claim that Juror No. 3 should not have been removed.  The Court has also likewise concluded that the state court's decision to remove the juror was neither contrary to clearly established Supreme Court authority and was not an unreasonable determination of the facts.  Consequently, the Court need not address whether Stutzman's counsel waived the argument and thereby provided ineffective assistance.

In sum, the Court concludes the state court's adjudication did not result in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, and did not result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented.  Thus, the Court recommends denying Stutzman's request for habeas relief on this claim.

### c.  Claim Two: Insufficient Evidence for Carjacking

In his second claim, Stutzman contends that the evidence was insufficient to sustain the carjacking verdict in count 14.  (Dkt. No. 1 at 26.)  Respondent contends Stutzman's insufficient evidence claim is unexhausted because he did not raise it in his petition before the California Supreme Court.  (Dkt. No. 11-1 at 42.)

### i.  Exhaustion

As Respondent notes, although Stutzman raised this claim before the Court of Appeal, Stutzman was also required to present this claim to the California Supreme Court in his petition, which was filed back on March 25, 2014.  (*See* Lodg. 7.)  It appears the

time has now passed to do so and  state court remedies are no longer available for this claim.  *See e.g., Walker v. Martin*, 562 U.S. 307, 311-312 (2011) (holding that California's timeliness requirement providing that a prisoner must seek relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied).

Thus, contrary to Respondent's contentions that the petition is mixed, Stutzman has technically exhausted his state court remedies.  *See Cassett v. Stewart*, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer 'available' to him.")  The claim is now technically exhausted and procedurally defaulted in this Court.  *Coleman v. Thompson*, 501 U.S. at 735 n.1 (holding that a procedural default arises when "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."); *see id*. at 729-30 (a procedural default arises from a violation of a state procedural rule which is independent of federal law, and which is clearly established and consistently applied.)

The Court may reach the merits of a procedurally defaulted claim if a petitioner can demonstrate cause for his failure to satisfy the state procedural rule and prejudice arising from the default, or that a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claim.  *Coleman*, 501 U.S. at 750. Here, however, the Court need not determine whether Stutzman could make a sufficient showing to excuse a default because this claim is without merit.  *Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.")  As explained below, Stutzman's claim fails on the merits.  The Court thus finds the interests of judicial economy support denying this claim on the merits without making findings as to whether

the state court denied the claim on the merits or whether the claim is procedurally barred. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.")

When a federal habeas court addresses the merits of a claim that was not adjudicated on the merits in state court, pre-AEDPA *de novo* review is required. *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002).[7]  Under such a review, "state court judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005). "Nonetheless, under AEDPA, factual determinations by the state court are presumed correct and can be rebutted only by clear and convincing evidence." *Pirtle,* 313 F.3d at 1168.  Accordingly, the Court now turns to analyze Stutzman's sufficiency of evidence claim under a *de novo* review.

### ii.  Sufficiency of Evidence Analysis

Stutzman claims insufficient evidence exists to establish he took a vehicle by force or fear in the immediate presence of a person who had a possessory interest in the vehicle.  (Id.)  In support, he argues that during the second drug run when he and

---

[7] Determining the appropriate standard of review for this claim is somewhat complicated. Generally, a federal court applies a *de novo* standard of review to an unexhausted claim because typically no reasoned state court decision on an unexhausted claim exists and thus no decision exists to defer to under AEDPA. *See Rodarte v. Ducart*, 2015 U.S. Dist. LEXIS 175300, *9-10, fn.2 (C.D. Cal. Nov. 2, 2015) *citing Pirtle*, 313 F.3d at 1167. Here, however, the California Court of Appeal issued a reasoned decision rejecting Stutzman's sufficiency of evidence claim.  A lack of clear authority exists as to the appropriate standard of review in this type of situation, and so this Court, like those before it, applies a *de novo* standard because a claim that fails under that standard would necessarily fail under AEDPA's deferential standard. *Rodarte*, 2015 U.S. Dist. LEXIS 175300 at *9-10, fn.2, *citing Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can, however, deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.") (citation omitted).

Kimberly used Nicole's car to purportedly meet his supplier, Stutzman was initially lawfully in the vehicle.  Thus, Stutzman argues, his subsequent criminal acts against Kimberly does not change the fact that he was lawfully in the vehicle and did not take try to take the vehicle by force or fear.  (Id. at 26.)

Stutzman also argues no evidence demonstrates he took by force or fear the vehicle when he later fled the apartment scene with Kimberly.  He contends the car was merely used to effectuate his departure from the scene, and he did not intend to temporarily or permanently deprive Kimberly possession of the car.  (Id. at 27.)

Respondent contends the prosecution put forth sufficient evidence to establish Stutzman took the car against Kimberly's will using force or fear.  Respondent also argues Stutzman intended to deprive her either temporarily or permanently of the car. (Id. at 47-50.)

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  The Supreme Court subsequently announced the federal standard for determining the sufficiency of the evidence to support a conviction in *Jackson v. Virginia*, 443 U.S. 307 (1979).  Under *Jackson,* "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original).  In applying *Jackson*, federal courts must refer to the substantive elements of the criminal offense as defined by state law at the time the crime was committed.  *Id.*, 443 U.S. at 324 n.16.  In *Jackson*, the Supreme Court "emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review."  *Wright v. West*, 505 U.S. 277, 296 (1992) (referencing *Jackson*).  The Supreme Court said that "'*all* of the evidence is to be considered in the light most favorable to the prosecution,' … that the prosecution need not affirmatively 'rule out every hypothesis except that of guilt,' … and

that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright*, 505 U.S. at 296-97 (*quoting Jackson*, 443 U.S. at 319, 326).

Under AEDPA, federal courts must also "apply the standards of *Jackson* with an additional layer of deference," *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). Here, however, because pre-AEDPA *de novo* review applies, this "additional layer of deference" is inapplicable to this analysis.

Carjacking is defined in California Penal Code section 215(a) as follows:

> the felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear.

To prove a defendant guilty of this crime, the prosecution must prove that:

1. The defendant took a motor vehicle that was not his own;

2. The vehicle was taken from the immediate presence of a person who possessed the vehicle or was its passenger;

3. The vehicle was taken against that person's will;

4. The defendant used force or fear to take the vehicle or to prevent that person from resisting;

and

5. When the defendant used force or fear to take the vehicle, he intended to deprive the other person of possession of the vehicle either temporarily or permanently. (CALCRIM No. 1650; 1 CT 237.)

Here, considering the evidence in the light most favorable to the prosecution, sufficient evidence exists for any rational trier of fact to have found Stutzman committed a carjacking beyond a reasonable doubt. As to the second drug run, evidence

demonstrates that when Stutzman took Kimberly inside his workplace, he came up behind Kimberly, put his hand around her face, held a knife to her throat and said, "Don't say anything and don't do anything or I'll kill you." (Lodg. 1, 4 of 15 ("4 RT") 396.) Stutzman tied Kimberly's hands, put a T-shirt over her head, and walked her to Nicole's car, holding a knife to her side and threatening to kill her. (4 RT 399-400.) Evidence also demonstrates that Stutzman grabbed the keys to the car from Kimberly, pushed her in the car and closed it, and then got in the driver's seat to drive back to Nicole's apartment. (4 RT 401.) Further, as to the incident that occurred when Stutzman fled the scene, the evidence demonstrates Stutzman grabbed Kimberly by the neck, threatened her life and "made [her] go back down to [Nicole's] car." (4 RT 424-425.) He had the keys he had taken earlier, and made Kimberly get in the driver's seat. (4 RT 426.)

Stutzman's argument that he did not engage in carjacking because he was initially lawfully in the vehicle with Kimberly on the way to his workplace, and because he later used the vehicle as a means to flee the scene, is unpersuasive. Based on the evidence as applied to the elements of carjacking, the jury could have reasonably inferred that Stutzman intended to both engage in the other charged criminal acts of false imprisonment against Kimberly and also undertake a carjacking. On the second drug run, Stutzman tied Kimberly up, threatened her life using force or fear, took the keys and car from Kimberly's immediate presence and her forced her into the car, and took a vehicle that was not his own with the intent to temporarily or permanently deprive her of its possession as he drove Kimberly back to the apartment to sexually assault both her and Nicole. Likewise, during the event when Stutzman fled the scene, he threatened Kimberly's life using force or fear and used the keys he had taken forced Kimberly into the car and directed her where to drive.

Nor do Stutzman's citations to *People v. Medina*, 39 Cal. App. 4th 643, 650-651 (1995) or *People v. Hoard*, 103 Cal. App. 4th 599 (2002) support Stutzman's contentions. In *Medina,* the state appellate court rejected the defendant's contention that the evidence was insufficient to support the carjacking conviction; there, the defendant argued the

statute requires physical proximity to the vehicle, that he was not near the vehicle at the time, and thus he could not have put the driver or passengers in immediate physical danger.  In affirming the carjacking conviction, the state appellate court explained that the defendant planned a forceful taking of the car, and the only reason the victim was not near the car was because he had been lured away from it by trick or device.  *Id.* at 651-52.  In *Hoard,* the state appellate court affirmed the carjacking conviction even though the defendant took the car by threatening the victim and demanding her keys when the victim was not physically present next to her car.  *Id.,* 103 Cal. App. 4th at 608-09.  In short, these cases do not stand for the proposition that a defendant has not engaged in crime of carjacking where the defendant uses the vehicle as a means to complete other criminal acts.  Furthermore, *Medina* is inapposite because Stutzman does not make any contention as to whether or not he tried to lure Kimberly away from the vehicle by trick or device, and *Hoard* is inapposite because the evidence demonstrates Stutzman was immediately physically present by Kimberly when he forced her into the car.

In sum, viewing this evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of carjacking beyond a reasonable doubt.  Consequently, the Court concludes the adjudication of this claim did not violate Stutzman's federal constitutional right to due process.  Accordingly, the Court recommends denying Stutzman's request for habeas relief on this claim.

**IV.   Conclusion**

The Court submits this Report and Recommendation to the United States District Judge assigned to this matter under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d)(4) of the United States District Court for the Southern District of California.

**IT IS RECOMMENDED** that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition for Writ of Habeas Corpus.

**IT IS ORDERED** that no later than **October 12, 2016**, any party to this action may file written objections with the Court and serve a copy on all parties. The document

should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be filed with the Court and served on all parties no later than **October 19, 2016**.

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

Dated:  September 21, 2016

Hon. Nita L. Stormes
United States Magistrate Judge